UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, v. VICTOR H. OROZCO, Defendant. | Case No. 3:13-cr-00048-MMD-WGC<br>ORDER<br>(Def's Motion to Suppress Evidence and Statements – dkt. no. 31) |

## I. SUMMARY

Before the Court is Defendant Victor H. Orozco's Motion to Suppress Evidence and Statements ("Motion"). (Dkt. no. 31.) For the reasons discussed herein, the Motion is denied.

## II. BACKGROUND

### A. Procedural History

Orozco is charged with two counts of possession with intent to distribute controlled substances and one count of smuggling goods into the United States. (Dkt. no. 16.)

Orozco filed the Motion (dkt. no. 31), and the Government filed a response (dkt. no. 40). Subsequent to the filing of the Motion, Orozco's counsel withdrew and he was appointed new counsel. (Dkt. no. 42.) The Court denied the Motion without prejudice in order to give new counsel the opportunity to review discovery material. (Dkt. no. 50.) At the request of Orozco's counsel, the Court then reopened the Motion and granted Orozco time to file a reply. (Dkt. no. 62.) Orozco filed a reply. (Dkt. no. 64.) The Court

held an evidentiary hearing over the course of two (2) days regarding the Motion (dkt. nos. 72, 73) and the parties filed post-hearing briefs (dkt. nos. 76, 77). The Court subsequently held one final day of evidentiary hearing in which Orozco called his final witness. (Dkt. no. 79.)

**B. Relevant Factual Background**

The following facts are taken from Trooper Zehr's testimony, Trooper Boynton's testimony and Trooper Zehr's police report.

On April 27, 2013, Trooper Zehr was on active patrol in a fully marked Nevada Highway Patrol ("NHP") unit on US 6 in White Pine County, Nevada. (Dkt. no. 69, Exh. A.) He initiated a traffic stop of a commercial tractor trailer being operated by Orozco. (*Id.*) The tractor trailer had a red tractor, white box trailer and Michigan plates. (*Id.*) Trooper Zehr initiated the stop in order to conduct a North American Standard (NAS) level III safety inspection. (*Id.*) He also initiated the stop because of information he received from Detective Sergeant Brewer, with the Nevada Division of Investigations (NDI), "who advised that he had received a source of information that . . . there was a commercial motor vehicle possibly engaging in criminal activity and could possibly have drugs in the vehicle" and that said vehicle had a red tractor and Michigan plates. (Dkt. no. 74 at 24:25; 25:1-23.) Trooper Zehr and Trooper Boynton, also present at the time of the stop, had received updates as to the expected travel time of said vehicle and were waiting for its arrival.[1] (Dkt. no. 75 at 215, 218-20.)

Trooper Zehr approached Orozco from the passenger's side of the tractor with Trooper Boynton. (*Id.* at 176:10-19.) When Trooper Zehr first approached Orozco, he observed that Orozco appeared nervous. (Dkt. no. 69, Exh. A; dkt. no. 74 at 27:21-25;

///

[1]On the final day of the evidentiary hearing, Sergeant Brewer testified that he had received a call from "the tipster" on April 26, 2013, indicating that the tractor trailer was delayed and a subsequent call informing him of the vehicle's expected travel time on April 27, 2013. Sergeant Brewer testified that he provided this information to Trooper Zehr by telephone.

28:1-8.) Trooper Zehr also noticed "religious items" in the tractor and an "overwhelming air freshener smell." (Dkt. no. 74 at 100:3-17.)

Trooper Zehr asked Orozco for his license and paperwork for a commercial vehicle inspection. (Dkt. no. 69, Exh. A.) The paperwork Orozco provided included a lease agreement. (Dkt. no. 74 at 32:3-7.) Trooper Zehr and Trooper Boynton noticed that the lease agreement conflicted with Orozco's statement that he owned the company and further noticed that the exterior of the truck did not indicate that it was leased and also did not indicate what company Orozco was operating under. (*Id.*; *see also* dkt. no. 75 at 198:6-17.) The paperwork Orozco provided also included his logbook. (Dkt. no. 74 at 15:1-16.) Trooper Zehr noticed that Orozco's logbook entries appeared to be missing required information, making it difficult to determine how long Orozco had been on the road and whether he was concealing hours of service. (Dkt. no. 69, Exh. A; dkt. no. 74 at 34:21-25; 35:1-10.) He also noticed the log book indicated that Orozco had a co-driver, which appeared to be inconsistent with the identified downtime and sleep berth time. (Dkt. no. 74 at 36:4-19; 49:18-25; 50:1-3; 55:15-18.) Troopers Zehr and Boynton also believed the presence of a co-driver was inconsistent with the amount of time it took Orozco to travel from Washington to Nogales, AZ, which further indicated that time might have been concealed. (*Id.* at 55:2-10; 61:15-18; dkt. no. 75 at 180:3-25; 190:21-23; 191:2-6.) Shipping papers are routinely examined in an inspection. (Dkt. no. 75 at 186.) In trying to determine when loads were picked up and dropped off, Troopers Zehr and Boynton noticed that shipping papers provided by Orozco indicated that he picked up his load of watermelons on a day that he was, according to his logbook, off-duty. (Dkt. no. 74 at 42-43; dkt. no. 75 at 186-88.)

After going over the logbooks and papers with Orozco for approximately twenty (20) minutes, Trooper Zehr walked away from the tractor and spoke on the phone to Trooper Barney, who was waiting within a mile, to discuss a canine sniff of the tractor trailer. (Dkt. no. 74 at 53-54.) He did so because he was suspicious of criminal activity and wanted to have the "resources available" to investigate criminal matters. (*Id.* at

55:23-25; 56:1-7.) Trooper Zehr returned to his patrol car and ran a license check and criminal history check with dispatch. (*Id.* at 59-60.) During this time, Trooper Boynton was still speaking with Orozco. (*Id.* at 59:10-23.)

Approximately thirty (30) minutes after the initial stop, Trooper Boynton walked back to Trooper Zehr's patrol car and discussed his confusion regarding Orozco's co-driver. (Dkt. no. 75 at 193:5-13.) Trooper Boynton walked back to the tractor to question Orozco about the co-driver and was called back by Trooper Zehr who asked him to see if he could spot any "indicators" of criminal activity inside the cab of the tractor. (Dkt. no. 74 at 67-68; dkt. no. 75 at 192-193.) Trooper Zehr called his sergeant and discussed whether or not he has "reasonable suspicion" to hold Orozco longer and also discussed "rolling into" asking Orozco for consent to search his tractor trailer once the inspection is complete. (*Id.* at 71:1-25; 72:1.) At this time, Trooper Barney looked at the tractor and was "on the phone with the El Paso Intelligence Center ("EPIC"), and making inquiries [as] to the company, the tractor and the trailer, and the driver." (*Id.* at 70:17-22.)

Approximately forty (40) minutes after the initial stop, Trooper Boynton walked back to Trooper Zehr's patrol car and told Trooper Zehr that he was still confused. (*Id.* at 72-73; dkt. no. 75 at 195:22-25; 96:1-7.) Trooper Zehr testified they were confused over "[w]hether or not [Orozco] had two trucks, whether or not he had more drivers, where his other trucks were, and how the truck that Mr. Orozco claimed he had the additional truck that he claimed he had, how it got from Washington to Nogales." (Dkt. no. 74 at 73:5-8.) Trooper Zehr asked other officers to leave so that there would not be an "overwhelming presence of law enforcement" when he asks Orozco for consent to search his tractor trailer. (*Id.* at 75:1-3.) Trooper Boynton received information from Trooper Barney, based on information from EPIC, that Orozco had made border crossings, and Trooper Boynton compared that information with the logbook entries. (*Id.* at 78:1-8; 78:21-24; dkt. no. 75 at 196:8-15.)

Approximately fifty (50) minutes after the initial stop, Trooper Zehr was finishing the inspection paperwork. (Dkt. no. 74 at 83:9-14.) Trooper Boynton asked Orozco to

step out of the tractor and asked him about the border crossings. (Dkt. no. 75 at 200-02.) Orozco initially denied that he had crossed the border but changed his answer and admitted he did cross the border the previous day. (*Id.*) Trooper Zehr finished his paperwork and decided to not write up Orozco for any violations, though he believed some violations to have been committed, including form and manner of the logbook and fictitious log entries. (Dkt. no. 74 at 85:17-25; 86:1-7.) Trooper Zehr gave Orozco the inspection form and all of his paperwork back. (Dkt. no. 69, Exh. A.) With only Trooper Boynton present, Trooper Zehr asked Orozco for consent to search the tractor trailer. (Dkt. no. 74 at 88-93.) In addition to providing verbal consent, Orozco signed the form that explained the consent to search, which Trooper Zehr provided him. (*Id.*; dkt. no. 69, Exh. A) After signing the form, Orozco went and got the key to his trailer. (Dkt. no. 74 at 91:12-14.)

Trooper Barney then arrived with a K9, who made a positive alert. (Dkt. no. 69, Exh. A.) Trooper Zehr again asked Orozco for his consent to search and Orozco verbally consented. (*Id.*) Trooper Zehr located a black duffle bag in Orozco's sleeper birth, which contained what appeared to be drugs. (*Id.*)

## III. DISCUSSION

Orozco argues the following: (1) the administrative inspection stop was pretextual; (2) the stop exceeded the scope of an administrative inspection without reasonable suspicion; and (3) Orozco's consent to search was not knowingly, intelligently and voluntarily given. (*See* dkt. no. 76; *see also* dkt. no. 74 at 11:4-13.)

The Court begins its analysis with Nevada's administrative inspection program. The Ninth Circuit in *United States v. Delgado*, 545 F.3d 1195 (9th Cir. 2008) holds that states may establish statutes for administrative warrantless inspection of commercial vehicles in accordance with the three-factor analysis in *New York v. Burger*, 482 U.S. 691 (1987), even where said statutes allow for unfettered discretion in conducting inspections without first observing a regulatory violation. *Delgado*, 545 F.3d at 1201-03. Nevada has adopted statutes allowing for warrantless administrative searches of

commercial vehicles. Nevada's statute defines the NHP's duties to "include, without limitation . . . [t]o enforce the provisions of laws and regulations relating to motor carriers, the safety of their vehicles and equipment, and their transportation of hazardous materials and other cargo." NRS § 480.360(4). Such "laws and regulations" in turn include "the regulations contained in 49 C.F.R. Parts 40, 382, 383, 385, 387, 390 to 393, inclusive, 395, 396 and 397, and Appendices B and G of 49 C.F.R. Chapter III, Subchapter B[.]" NRS § 706.173; NAC 706.247(1). Under Nevada's statutory scheme, the NHP may work in conjunction with the DMV to enforce NRS § 706.171(1)(d), which states that they may "[e]xcept as otherwise provided in this section, examine, at any time during the business hours of the day, the books, papers and records of any fully regulated carrier, and of any other common, contract or private motor carrier doing business in this State to the extent necessary for their respective duties." NRS § 480.360(3); NRS § 706.171(1)(d).

The Government contends the stop at issue falls within Nevada's statutory administrative warrantless inspection scheme. The Government further contends in its post-hearing brief that, "the general validity of the [NAS level III] inspection of tractor-trailers is not in question in this case." (Dkt. no. 77 at 19.) Orozco does not challenge the constitutionality of Nevada's statutory scheme or the NHP's ability to conduct a stop for the purposes of an NAS level III inspection.[2]

///

[2]Orozco does state that the CFR provisions adopted in Nevada are promulgated by the Federal Motor Carrier Safety Administration ("FMCSA"), which has adopted the North American Standard Inspection Program ("NASIP"), and that the NASIP procedures were not at issue in *Delgado*. (Dkt. no. 64 at 3-4.) Orozco thus asserts that the constitutionality of Nevada's NAS level III inspection procedure has not been ruled on by the Ninth Circuit. Orozco points out that a similar procedure was found to be constitutional under the *Burger* analysis in the Eighth Circuit. (*Id.* (citing *United States v. Mendoza Gonzalez*, 363 F.3d 788 (8th Cir. 2004)). However, Orozco does not present any argument as to why the relevant administrative inspection procedure in Nevada may be unconstitutional under *Burger*. Indeed, Orozco concedes that he "assumes this Court . . . would find" a NAS level III stop carried out by a certified NHP officer to be constitutional. (Dkt. no. 64 at 4.) The Court finds that any argument that the NHP is without authority to carry out a NAS level III inspection has not been properly raised by Orozco and will not be addressed.

**A. The Initial Stop**

Orozco argues that the NAS level III inspection was an impermissible pretext "motivated by a desire to search for evidence of drug trafficking, rather than to conduct a commercial vehicle inspection." (Dkt. no. 76 at 2.) There is no dispute that individualized suspicion was part of the reason Trooper Zehr stopped Orozco's vehicle for an administrative inspection. Trooper Zehr testified that he initiated the stop for two reasons: (1) to conduct a safety inspection; and (2) because information provided by a tipster indicated that a tractor trailer matching the one being driven by Orozco could be carrying drugs. (Dkt. no. 74 at 24:19-25; 25:1-23.) The question is whether such dual purposes render an otherwise valid administrative stop illegal.

Generally, an officer having dual motives does not make a warrantless search pretextual, so long as it is conducted pursuant to a lawful administrative scheme with a constitutionally permissible motivation. *United States v. McCarty*, 648 F.3d 820, 833 (9th Cir. 2011) (citations omitted); *see also United States v. Bowhay*, 992 F.2d 229, 231 (9th Cir. 1993). In the context of general administrative schemes that do not require individualized suspicion, the inquiry into an officer's motive is thus at the programmatic level, and the Court will otherwise not inquire into the minds of individual officers. *City of Indianapolis v. Edmond*, 531 U.S. 32, 45-46 (2000). The Ninth Circuit "has consistently held that if the scheme under which the administrative search is conducted is constitutional, the subjective motive of the individual conducting the search will not invalidate the search." *United States v. Bulacan*, 156 F.3d 963, 966-67 (9th Cir. 1998) (citing *Bowhay*, 992 F.2d at 231).

After analyzing the relevant case law in the Ninth Circuit, the court in *McCarty* holds that, regardless of their subjective beliefs, officials are able to carry out a valid administrative inspection so long as "(1) the search was undertaken pursuant to a legitimate administrative search scheme; (2) the searcher's actions are cabined to the scope of the permissible administrative search; and (3) there was no impermissible programmatic secondary motive for the search[.]" *McCarty*, 648 F.3d at 834-35 (citations

omitted). The administrative search scheme in *Bulacan* provides an example of an improper secondary programmatic purpose. In that case, the officers performed administrative searches on entrants to a federal building. 156 F.3d at 965. The administrative search was primarily for weapons and explosives, "conducted in light of the heightened danger following the Oklahoma City bombing." *Id.* at 968. However, the officers performing the administrative searches were also instructed to search for narcotics. *Id.* The *Bulacan* court held that "when an administrative search *scheme* encompasses both a permissible and an impermissible purpose, and when the officer conducting the search has broad discretion in carrying out the search, that search does not meet the Fourth Amendment's reasonableness requirements." *Id.* at 973 (emphasis added). Thus, "[c]entral to *Bulacan*'s holding was that the search scheme itself imposed an additional, impermissible motive unrelated to administrative purposes, such that individual officers, in exercising the broad discretion granted them, could conduct more extensive searches based on the secondary law enforcement-related motive." *McCarty*, 648 F.3d at 833 (emphasis added) (citing *Bulacan*, 156 F.3d at 971, 973.).

In this case, the constitutionality of the administrative scheme allowing for NHP officers to carry out an NAS level III safety inspection of Orozco's tractor trailer is not in dispute. Orozco does not argue that Trooper Zehr's initiation of the stop of Orozco's tractor trailer was itself outside of the scope permissible pursuant to an NAS level III safety inspection. Finally, and most crucially, Orozco fails to show that the administrative inspection scheme contained an impermissible secondary programmatic purpose. Orozco asserts that Troopers Zehr and Boynton testified that the use of an administrative stop to pursue an investigation "is a recognized and established practice by the Nevada Highway Patrol" and "an established and proper practice." (Dkt. no. 76 at 2, 6.) However, Orozco mischaracterizes the testimony to which he cites. The relevant testimony from Trooper Boynton is that it is "common knowledge" that Troopers Zehr and Boynton can use their administrative inspection ability to stop a truck that they also believe to be involved in criminal activity. (Dkt. no. 75 at 216:7-17.) Trooper Boynton

testifies to this after clearly stating that Orozco's tractor trailer was stopped both for an administrative inspection and because they believed it was transporting drugs. (*Id.* at 215:22-25; 216:1-6.) The Court finds no evidence in this case that NHP officers are trained or instructed to investigate criminal activity while carrying out an administrative inspection, or that such an investigation is a part of the relevant administrative scheme. Further, there is no evidence that Troopers Zehr and Boynton were instructed to investigate criminal activity while carrying out their administrative inspection duties. The Court therefore determines that, although there were dual purposes in Trooper Zehr's initiation of the stop, there was no impermissible purpose at the programmatic level that would render an otherwise permissible initiation of an NAS level III safety inspection invalid.[3]

To hold otherwise would lead to an illogical result. Orozco is in effect asking the Court to find that Troopers Zehr and Boynton could have stopped any commercial motor vehicle for an NAS level III safety inspection without individualized suspicion *except* those vehicles suspected of criminal activity as in this case. The Ninth Circuit has considered and rejected this argument: "Tsai essentially asks us to conclude that the customary, relatively uninvasive warrantless search that he underwent would be permissible with respect to any passenger *except* those whom the INS had cause to suspect of criminal activity. But this would turn customary Fourth Amendment reasoning on its head." *United States v. Tsai*, 282 F.3d 690, 695 (9th Cir. 2002).

As Orozco has failed to demonstrate an impermissible secondary purpose, Orozco's "pretext" argument must be premised on a finding that law enforcement stopped Orozco's truck for the sole purpose of searching for evidence of criminal activity.[4] The record does not support such a finding, however. Orozco points out that

[3]It may be argued that NHP officers should not conduct administrative safety inspections precisely because they are tasked with looking for criminal activity and thus necessarily extend the scope of the inspection beyond that of a dedicated safety inspector. That argument, however, is not presented by Orozco.

[4]Orozco cites to *Whren v. United States*, 517 U.S. 806, 811-12 (1996), which explains that a warrant and probable cause are required where a search is not made for *(fn. cont…)*

the officers involved in the inspection and search of Orozco's tractor trailer did not mention the tip of possible drug activity in any of their reports. (Dkt. no. 76 at 6.) Orozco surmises that the "only reasonable conclusion to draw from law enforcement's willful concealment of the reason for the stop is Orozco's contention that the secrecy was intended to hide the pretextual use of administrative authority and ensuing violation of the Fourth Amendment." (*Id.*) This argument presumes, without support, that the administrative inspection was pretextual to begin with. Even if the Court were to assume that the officers intended to cover up their impermissible motive, that does not discredit Trooper Zehr's testimony that an NAS level III safety inspection was at least in part the reason for the stop.

That an NAS level III safety inspection was in part the reason for the stop is borne out by the officers' conduct in initiating the stop. Trooper Zehr testified that he received his certification and training in conducting NAS level III inspections. (Dkt. no. 74 at 14.) Trooper Boynton also testified that he is authorized to conduct NAS level III inspections. (Dkt. no. 75 at 172.) Both testified they have conducted such inspections in the past. (Dkt. no. 74 at 14; dkt. no. 75 at 172.) Trooper Zehr describes an NAS level III safety inspection as "a driver paperwork safety inspection consisting of many documents that the Feds regulate in the trucking industry." (Dkt. no. 74 at 15:4-16.) Such paperwork includes driver logbooks, which "recreate their duties throughout the day." (*Id.*) According to Trooper Zehr, drivers "need to, if they're operating seven days a week . . . maintain the day that they're driving, plus seven days" and be able to provide the logbooks "to law enforcement who are doing the inspections," along with logbook history. (*Id.*) Records

---

*(… fn. cont.)*
the purpose of an inventory or administrative regulation. In a later case, also cited by Orozco, the Supreme Court of the United States cites *Whren* for the proposition that exceptions to the warrant and probable cause requirements for a search "do not apply where the officer's purpose is *not* to attend to the special needs or to the investigation for which the administrative inspection is justified." *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2081 (2011) (emphasis added) (citing *Whren*, 517 U.S. at 811–12). *Whren* does not address circumstances in which an officer has both an impermissible motivation and a permissible administrative motivation.

relevant to the inspection must be maintained in case of a safety audit. (*Id.*) Prior to pulling Orozco over, Trooper Zehr stated that he was stopping Orozco's tractor trailer for an inspection. (Dkt. no. 74 at 24:19-21.) The officers initially positioned themselves outside of the tractor, asked some general questions of Orozco while Orozco produced paperwork, received paperwork including his logbook, looked through the logbook as well as other paperwork provided by Orozco and asked him questions related to the paperwork. (Dkt. no. 74 at 26-34; dkt. no. 75 at 176-180.) This conduct by the officers in their initial stop and interaction with Orozco does not appear to be outside the scope of a typical NAS level III safety inspection.[5]

The Court finds that the stop of Orozco's tractor trailer was permissibly initiated in part pursuant to an administrative inspection scheme and that investigation of possible criminal activity was not the sole purpose of the stop.

**B. The Inspection**

As the initial stop was permissible, the Court will address Orozco's second argument that the officers' conduct following the stop extended beyond the scope of the administrative inspection so as to require reasonable suspicion. The administrative exception can no longer justify continuation of a warrantless search "at the point at which the search ceases to be for the valid administrative purpose[.]" *McCarty*, 648 F.3d at 835. That is, the officers' actions must be no more intrusive than necessary to achieve

---

[5]Orozco cites to *United States v. Millan*, 36 F.3d 886, 890 (9th Cir. 1994) to argue that a stop is objectively pretextual "where the reasonable officers would not have made the stop absent a desire to search for evidence of more serious crime." (Dkt. no. 64 at 15.) *Millan* involved a traffic stop that required suspicion of a traffic violation to initiate. 36 F.3d at 888-89. The court in *Milan* thus found it significant that the officers initiated a traffic stop on the basis of only a small crack on the windshield, a minor safety violation, and that the Government could not establish that driving with a cracked windshield was illegal in Nevada. *Id.* The court found it further significant that the stop was suggested by an officer with no traffic enforcement responsibilities and that there was testimony by the officers that they were trained to make a traffic stop "to see if the subject is maybe committing a crime." *Id.* at 889-90. In this case, Troopers Zehr and Boynton are trained to conduct safety inspections, could do so without individualized suspicion pursuant to an administrative scheme and there is no evidence they were trained to use the safety inspection to investigate criminal activity. Indeed, Sargent Brewer testified that he provided the tipster's information to Trooper Zehr but otherwise did not tell him how to stop the vehicle or develop probable cause. *Milan* is therefore inapposite.

the administrative purpose. *Bowhay*, 992 F.3d at 231 ("When police conduct would have been the same regardless of the officer's subjective state of mind, no purpose is served by attempting to tease out the officer's 'true' motivation.") However, officers carrying out a commercial vehicle inspection may ask questions unrelated to the administrative inspection without reasonable suspicion, as long as it does not prolong the detention of the individual. *Delgado*, 545 F.3d at 1205 (citing *United States v. Mendez*, 476 F.3d 1077, 1080 (9th Cir. 2007). Thus, the task for this Court is to determine the scope of the inspection and analyze if and when the officers exceeded that scope in an effort to investigate criminal activity. *See McCarty*, 648 F.3d at 835.

Orozco submits a brief passage from the Commercial Vehicle Safety Alliance ("CVSA") website that describes an NAS level III safety inspection:

> An examination that includes those items specified under the North American Standard Level III Driver/Credential Inspection Procedure. As a minimum, Level III inspections must include, where required and/or applicable, examination of the driver's license; medical examiner's certificate and Skill Performance Evaluation (SPE) Certificate; driver's record of duty status; hours of service; seat belt; vehicle inspection report(s); and HM/DG requirements. Those items not indicated in the North American Standard Level III Driver/Credential Inspection Procedure shall not be included on a Level III inspection.

(Dkt. no. 64 at 5 (citing http://www.cvsa.org/programs/nas_levels.php)). Based on this description, Orozco argues that the inspection "should have concluded fairly quickly" and not lasted approximately one (1) hour. (*Id.*) However, this description is cursory at best. It fails to explain what an "examination" of the relevant documents entails and what inspectors look for when examining these documents.

Trooper Zehr testified that in a safety inspection, he examines logbooks for violations of 49 C.F.R. § 395. (Dkt. no. 74 at 16:4-20.) Section 395, which was adopted in Nevada pursuant to NRS § 706.173 and NAC 706.247(1), contains a host of provisions as to the form of the logbooks and what information it must contain. 49 C.F.R. § 395.8. The logbook entries must take the form of a standard grid provided in Section 395. *Id.* Drivers must record when they are off duty, in the sleeper berth, driving, or on duty and not driving. *Id.* For each change in status, the driver must record "the name of

the city, town, or village, with State abbreviation[.]" *Id.* The standard grid must be filled out with the date, total driving miles, tractor trailer number, name of carrier, driver's signature, 24-hour period starting time, main office address, remarks, name of co-driver, total hours and shipping document number or name of shipper and commodity. *Id.* Section 395 provides instructions on how to fill out the grid with the required information and provides an illustrated example. *Id.* "Failure to complete the record of duty activities of this section[,] . . . failure to preserve a record of such duty activities, or making of false reports in connection with such duty activities shall make the driver and/or the carrier liable to prosecution." 49 C.F.R. § 395.8(e). The driver is required to retain a copy of the logbook entries "for the previous 7 consecutive days which shall be in his/her possession and available for inspection while on duty." 49 C.F.R. § 395.8(k)(2). Pursuant to commercial vehicle regulations, officers must therefore examine logbooks for false entries or improper entries.

Scrutiny of the logbook for false or improper entries is important to the purpose of the administrative inspection, which is to ensure commercial motor vehicles are operating in compliance with safety regulations. Trooper Zehr testified that logbook entries are reviewed to determine whether a driver is violating regulations as to how long they may be on duty or driving before they need to spend time off duty or in a sleeper birth to reset. (Dkt. no. 74 at 17:3-10; 18:5-11.) Trooper Zehr testified that a safety inspection can take "[a]nywhere from 15 minutes to two hours." (*Id.* at 19:20-24.) Orozco offers no evidence to counter Trooper Zehr's testimony about the length and scope of an administrative inspection.[6]

Trooper Zehr testified that in their initial interaction, he questioned Orozco about his logbook and checked the supporting paperwork and records to make sure they confirmed what the logbook says. (*Id.* at 31:12-24.) As detailed in the fact section *supra*, Trooper Zehr noticed, within the first twenty (20) minutes of his interaction with Orozco,

[6]As previously noted, Orozco merely asserts that the inspection should have taken less than one (1) hour. (Dkt. no. 64 at 5.)

that the logbooks were missing information, contained inconsistent information or flat-out contradicted the provided paperwork. Trooper Zehr testified that he'd "never seen anything that was so difficult to decipher and understand" as Orozco's logbook. (*Id.* at 50:13-15.) In particular, Trooper Zehr was confused about the amount of sleeper birth time indicated in the logbook, which appeared to be inconsistent with the indicated presence of a co-driver and inconsistent with the travel time indicated. (*Id.* at 36:4-19; 49:18-25; 50:1-3.) For Trooper Zehr, this added to his confusion over the ownership of truck because, if Orozco owned the truck, Orozco would have to be paying his co-driver through all that downtime. (*Id.* at 36:4-19.)[7]

After those first twenty (20) minutes, Trooper Zehr suspected criminal activity and spoke to Trooper Barney about a canine search. It is at this stage, Orozco argues, that the officers shifted their primary focus to investigating criminal activity.[8] (Dkt. no. 64 at 7, 9-10, 14.) However, Trooper Zehr testified that Trooper Barney was already within a mile and he did not instruct Trooper Barney to have the canine conduct a sniff at that time. (*Id.* at 53-54.) He also testified that at this stage the safety inspection was still ongoing.

[7]At the evidentiary hearing, the Government offered copies of Orozco's logbook entries as exhibits and Trooper Zehr explained aspects of the entries that he found to be confusing. On cross-examination of Trooper Zehr, Orozco's counsel solicited testimony to demonstrate possible explanations for some of the entries that confused Trooper Zehr. However, such explanations do not affect the Court's analysis. For example, regarding April 20, 2013, Trooper Zehr testified that he could not figure out why Orozco and his co-driver had separate entries that said Orozco was in the sleeper birth and his co-driver was off duty at the same time for the same seventeen-hour (17) period instead of alternating shifts, though the entries also indicated they were carrying a load of perishable pears from Washington to Nogales, AZ, at that time. (Dkt. no. 74 at 49-50; 161-62; dkt. no. 80, Exh. 3c.) On cross-examination, Trooper Zehr testified that Orozco's sleeper berth time on the 20th appeared to be recorded in Grandview, Washington, which was Orozco's place of residence at the time. (Dkt. no. 74 at 134-35.) Orozco's counsel suggested that Orozco could have made a mistake and recorded time home in bed as sleeper berth time. (*Id.*) Even if the Court accepts that Orozco made this mistake, however, that does not discredit Trooper Zehr's testimony that he found the entries to be confusing. In fact, such a mistake on Orozco's part in filling out his logbook further demonstrates that officers had to spend time questioning Orozco about his entries in order to ensure driving time was not being concealed and entries were not being falsified.

[8]Orozco states that after the first fifteen (15) minutes, "the NAS level III inspection was at best a secondary consideration . . . ." (Dkt. no. 64 at 7, 9-10.) As previously noted, however, the mere presence of dual purposes does not make the administrative inspection illegal.

(*Id.* at 56:8-10.) During the ten (10) minutes or so that Trooper Zehr was speaking to Trooper Barney and running Orozco's license and criminal check, Trooper Boynton was apparently still talking with Orozco about the logbook, which he only received for personal examination after Trooper Zehr stepped away from the tractor to speak to Trooper Boynton. (*Id.* at 54:15-24; dkt. no. 75 at 179-180.) When Trooper Boynton returned to Trooper Zehr's car after speaking with Orozco for those ten (10) minutes, Trooper Boynton expressed confusion to Trooper Zehr over the information Orozco had provided him as to the co-driver. (Dkt. no. 75 at 193:5-13.) As detailed in the fact section *supra*, in the next thirty (30) minutes of the inspection, Trooper Boynton went back to speak to Orozco in another attempt to clarify the inconsistencies regarding the co-driver; and Trooper Barney spoke on the phone with EPIC to try and sort out the confusion over the ownership of the truck and obtained information on where the tractor trailer had been. Trooper Barney received information from EPIC about a border crossing that conflicted with Orozco's logbooks and Trooper Boynton then questioned Orozco about that discrepancy. During this time, Trooper Zehr was making preparations to ask for consent to search the tractor trailer and was also finishing up the inspection paperwork and waiting for information from Troopers Barney and Boynton. (Dkt. no. 74 at 72:2-6.)

This chain of events indicates that the officers were still investigating false entries in Orozco's logbook up until Trooper Zehr finished the inspection paperwork and returned the inspection documents to Orozco. Numerous problems with the logbook were indeed discovered in the first twenty (20) minutes, but Defendant has offered no evidence to suggest that further inquiry into those problems over the course of the next forty (40) minutes was outside of the scope of an NAS level III safety inspection. Trooper Zehr testified that if he had issued Orozco violations for the improper form and manner of the logbook entries and the false entries, Orozco would have been put immediately out of service for ten (10) hours. (*Id.* at 164:1-19.) Because of the immediate adverse impact of a citation, it makes sense that inspectors would take the time to question drivers about potential false entries and confirm with outside intelligence units before issuing a

violation.[9] Trooper Zehr's actions in preparation for a possible search of the tractor trailer occurred simultaneous to Troopers Boynton and Barney's inspection efforts and therefore did not necessarily extend the scope of the inspection.[10] *See McCarty*, 648 F.3d at 838-39; *Delgado*, 545 F.3d at 1205.

Once Trooper Zehr decided not to issue any violations, the inspection certainly concluded as there was no longer an administrative purpose. He testified that he filled out the inspection form, without any violations indicated, at the conclusion of the inspection. (Dkt. no. 74 at 85:17-25; 86:1-7.) Following the completion of the inspection, Trooper Zehr asked Orozco for consent to search his tractor trailer.

Based on the evidence presented, the Court finds that the officers' inspection did not exceed the scope of the administrative scheme. While the officers were preparing for a possible search beyond the administrative inspection, those preparations and inquiries occurred as members of the team were still carrying out a lawful ongoing inspection. The officers' actions, including Trooper Zehr's observations about Orozco's demeanor and the odor in Orozco's tractor, Trooper Boynton's inquiry about the images of saints in Orozco's tractor, Trooper Zehr's discussions with Trooper Barney about arranging for a canine sniff, Trooper Zehr's discussions with his Sargent about how to approach the search following the inspection, and Trooper Zehr's request to the other officers to leave the area before he asks for consent did not exceed the scope of the administrative inspection that was still ongoing. *See McCarty*, 648 F.3d at 838-39; *Delgado*, 545 F.3d at 1205.

///

[9]This conclusion is based in large part on the testimony that the logbook entries were missing required information, contained inconsistent information and were uniquely difficult to understand. Such a lengthy inspection may not be warranted where a driver's logbook clearly complies with federal regulations.

[10]Trooper Boynton testified that he did speak with Orozco about the saints visible in his tractor, which is a discussion that could not possibly be related to the purpose of the administrative inspection. (Dkt. no. 75 at 195.) However, at that point the inspection was ending and Trooper Boynton told Orozco that Trooper Zehr was finishing the inspection paperwork. (*Id.*) This discussion as to the saints therefore did not extend the scope of the inspection.

**C. The Consent to Search**

After the inspection concluded, the officers could no longer rely on administrative authority to search Orozco's tractor trailer and needed Orozco's consent to carry out the warrantless search. *See Whren*, 517 U.S. at 811-12. Troopers Zehr and Boynton obtained Orozco's verbal consent and his signature on a consent to search form. Orozco's final argument challenges this consent.

To be valid, a consent to a warrantless search must be voluntary. *United States v. Kaplan*, 895 F.2d 618, 622 (9th Cir. 1990). In evaluating whether consent to a search is voluntary, the Court must consider: (1) whether defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether *Miranda* warnings were given; (4) whether the individual was told he had the right not to consent; and (5) whether the individual was told that a search warrant could be obtained. *United States v. Cormier*, 220 F.3d 1103, 1112 (9th Cir. 2000).

Applying these factors, the Court concludes that consent was voluntary. The Court has reviewed the video of the interaction provided by Orozco. (Dkt. no. 64, Ex, D.) Immediately after answering Orozco's final questions about the inspection paperwork, Trooper Zehr proceeded to ask for his consent to search the tractor trailer. At the time of the search, Orozco was not in custody and the arresting officers did not have their guns drawn. Orozco did not receive *Miranda* warnings, but he was not yet in custody so such warnings were not required. The written consent to search form provided to Orozco, which he signed, stated that he had the right to refuse to consent to the search and to refuse to sign the form. (Dkt. no. 80, Exh. 4.) Orozco was not told that a search warrant could be obtained.

Orozco argues that his consent was not voluntary because he was asked one hour after the initial stop, English is not his native tongue, he "exhibited confusion" with the paperwork he was provided, and he did not complete the consent to search form as directed by Trooper Zehr. (Dkt. no. 76 at 10.) Although the officer asked his consent following a proper administrative inspection that lasted approximately an hour, the video

reveals that the officers do not exhibit any force and Orozco appears to be relaxed and comfortable in dealing with the officers. The Court agrees that, from the video, it appears as though English is not Orozco's native language and he speaks with an accent,[11] but disagrees that he was confused about the consent to search form or Trooper Zehr's instructions for filling it out. Looking at the tape, Orozco is instructed to read the form and appears to do so for roughly 10 seconds from timestamp 17:44:15 to 17:44:25. Orozco tells the officers that he understands the English portion but understands the Spanish portion better. Orozco again takes the time to read the form for roughly twenty (20) seconds from 17:44:50 until 17:45:10. He then tells the officers that he thinks it's ok, points to the English portion that had been filled out by Trooper Zehr and confirms he can sign that portion. He then signs the English portion. Orozco never indicated that he did not understand the form. While the officers could have read the form to Orozco, the officers could have reasonably concluded that such a step was not warranted because Orozco told the officers he understood the form.[12]

Lastly, Orozco argues that the consent to search form uses the verb "registren," which, according to the Court translator, could also mean "to register" or "to view." (Dkt. no. 76 at 10.) In the past, however, the Ninth Circuit has affirmed a district court's determination, based on the testimony of a court translator, that in the context of the consent to search form, "registren" means "to search." *United States v. Rojas-Millan*, 234 F.3d 464, 470 (9th Cir. 2000).

///

---

[11]Trooper Zehr testified, however, that he had no difficulty communicating with Orozco in English. (Dkt. no. 74 at 30:6-11.) While the Court agrees with Orozco that his ability to communicate with the officers does not necessarily mean he understands the communication about consent to search, which may be a foreign concept to him as a non-native English speaker, the evidence in this case does not support his claim that he did not understand that he was giving the officers consent to search his vehicle.

[12]The form states that Orozco gives his consent to Trooper Zehr and Trooper Boynton to search any "luggage containers or items located in the interior and/or exterior of the vehicle." (Dkt. no. 80, Exh. 4.) Orozco's consent thus apparently gave the officers a valid basis to look inside the black duffle bag that contained the alleged illegal substances. (Dkt. no. 31 at 19.)

The Court concludes that Trooper Zehr stopped Orozco in part pursuant to a proper administrative purpose, that his actions in making preparations for a canine sniff and consent request did not cause officers to exceed the scope of the administrative inspection, and that following the conclusion of the inspection Orozco gave a valid consent to search. The Motion is therefore denied.

## IV. CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of this Order.

It is therefore ordered that Defendant's Motion to Suppress Evidence and Statements (dkt. no. 31) is denied.

DATED THIS 28th day of January 2015.

MIRANDA M. DU
UNITED STATES DISTRICT JUDGE